UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

                                                Case No.: 8:11-bk-00432-MGW

CARGO TRANSPORTATION
SERVICES, INC.,                          Chapter 11

      Debtor.
_____/

LARRY S. HYMAN, as Plan Trustee,

      Plaintiff,

vs.                                        Adv. Pro. No.: 8:13-ap-00580-MGW

BAST AMRON LLP,

      Defendant.
_____/

**MEMORANDUM OPINION ON
<u>CROSS MOTIONS FOR SUMMARY JUDGMENT</u>**

Under 11 U.S.C. § 550(a)(1), a trustee can recover the value of a preferential transfer

from an initial transferee unless the transferee served as a mere conduit for the transfer and

otherwise acted in good faith.  Here, the Debtor made six preferential transfers to the Defendant

as part of a settlement agreement in a preference action in another confirmed Chapter 11 case.

The settlement funds were deposited into the Defendant's trust account; however, the Defendant

had no right to use the funds. The Defendant was required to transfer the funds as directed by the

plan trustee with the presiding bankruptcy court's approval.  Under these circumstances, the

Court concludes that the Defendant was a mere conduit for the preferential transfers and

otherwise acted in good faith.    Accordingly, the Court will enter summary judgment in favor of the Defendant.

**Factual and Procedural Background**

Larry S. Hyman (the "Plan Trustee"), has sued the law firm of Bast Amron LLP (the "Law Firm") to recover certain preferential transfers. The factual background leading up to the preference action is not in dispute. Between October 22, 2010 and December 31, 2010, the debtor made six transfers in the amount of $5,000 for total alleged preferences of $30,000. The debtor filed its Chapter 11 petition on January 12, 2011. Therefore, each of the six transfers in question was made within 90 days of the debtor's bankruptcy petition.

The Law Firm received the transfers in its capacity as counsel for the plan trustee in another confirmed Chapter 11 case involving a debtor by the name of Solar Cosmetics Labs, Inc. In that case, the Law Firm represented the plan trustee of the Solar Cosmetics Liquidating Trust (the "SC Trust").

The Debtor in this case was a defendant in a preference action brought by the SC Trust that was settled for $150,000. The settlement amount was divided into twenty-nine (29) payments: an initial payment in the amount of $10,000 and twenty-eight (28) subsequent payments of $5,000 to be paid every two weeks. Under the terms of the settlement, the settlement payments were to be paid to the Law Firm's trust account. The settlement was approved by the bankruptcy court in the Solar Cosmetics case.

Along with the settlement, the bankruptcy court also approved a contingency fee arrangement which called for specific payment of the contingency fee equal to one-third of the settlement amount. Under the contingency fee arrangement approved by the bankruptcy court in the Solar Cosmetics case, the Law Firm was to be paid directly from the recoveries made from the preference actions brought on behalf of the SC Trust.

In accordance with the settlement, the Debtor in this case transferred six payments amounting to $30,000 to the Law Firm's trust account during the preference period. The settlement funds were then transferred from the Law Firm's trust account to its operating account. Fees that had been approved in the Solar Cosmetics Chapter 11 case were then paid, and the balance was transferred to the SC Trust.

According to the Law Firm, it never exercised any legal control over the settlement funds received.  Instead, the Law Firm merely held the funds in trust for delivery to the SC Trust in accordance with orders of the bankruptcy court in the Solar Cosmetics case, which controlled every step of the process in approving and implementing the terms of the settlement. The Law Firm did not have the ability to direct where the funds would be transferred other than through the direction of the plan trustee of the SC Trust and with approval of the bankruptcy court in the Solar Cosmetics case.

### Conclusions of Law[1]

Under § 547(b) of the Bankruptcy Code, a trustee may avoid a preferential transfer made within 90 days before the date of the filing of the petition.  And § 550 of the Bankruptcy Code authorizes the trustee to recover the value of any preferential transfer avoided under § 547 from the "initial transferee" of the preferential transfer.  In this case, there is no dispute that the six transfers in question fall within the 90-day preference period.  The issue is whether the Plan Trustee can recover the value of the six transfers in question from the Law Firm as an "initial transferee" under § 550(a)(1).

This Court previously presided over a case involving potential avoidable transfers to a law firm in the case of *In re Harwell*.[2] The District Court's affirmance of this Court's decision

---

[1] This Court has jurisdiction over this adversary proceeding under section 28 U.S.C. § 1334(b) and 11 U.S.C. §§ 544, 547, and 550.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (F).

3

was reversed by the Eleventh Circuit in a case that clarified the law applicable to attorneys and other parties who serve as intermediaries in the transfer of funds from a party that later files bankruptcy to the firm's trust account to then be disbursed as directed by the client.[3]

Under the holding of *Harwell*, a law firm may be considered the "initial transferee" even where the funds are deposited into the firm's trust account for the benefit of a client.  In some sense, the attorney involved in such a transaction certainly has control to write checks from the firm's trust account. However, courts, including the Eleventh Circuit, reject a literal meaning of "initial transferee" in favor of a "control" or "conduit" test to determine whether in such instances the recipient of an avoidable transfer of assets is the "initial transferee."[4]

Under the "control" test, as explained by the Eleventh Circuit in *Harwell*, the recipient of an avoidable transfer is an "initial transferee" only if the recipient exercises legal control over the assets, such that the recipient has the right to use the assets for its own purposes, and not if the recipient merely serves as a conduit for assets that were under the actual control of the intended transferee.[5]  The "control" test is an equitable exception to the literal statutory meaning of initial transferee.[6] An initial recipient seeking to take advantage of this equitable exception must not only establish that it did not have control over the assets, that is, that the initial recipient merely served as a conduit for the assets that were under the actual control of the debtor transferor, but also that it acted in good faith and as an innocent participant in the underlying transfer.[7]

_____

[2] Bankruptcy No. 05-41744-ABC (Colorado); Adv. No. 8:08-mp-00002-MGW.

[3] *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312 (11th Cir. 2010).

[4] *Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2010).

[5] *In re Harwell*, 628 F.3d at 1322.

[6] *Id.*
[7] *In re Harwell*, 628 F.3d at 1323.

On remand, this Court applied the test set forth by the Eleventh Circuit, and concluded that the defendant attorney in *Harwell* could make no credible argument that he was an unwitting or innocent participant in the transfers made by the debtor. The attorney knew that transfers were intended to get the money away from his client's major creditor's collection efforts.[8] He knew a judgment had been entered against his client.[9] And he knew that the transfers that he was instructed to make by his client to either the client or family members were meant to keep the money away from the creditor. In fact, the attorney in *Harwell* clearly went beyond the call of duty when, on his own notion, he obtained cashier's checks—something he had never done before for any client—to ensure that there would be absolutely no money left to be applied toward the judgment against his client.[10]

Since *Harwell,* this Court has encountered the "control" or "conduit" defense on two separate occasions.[11] Both occasions, however, involved the Ponzi scheme of Ulrich Engler, a notorious criminal who perpetrated a massive Ponzi scheme bilking investors out of over $170 million. In both cases, this Court concluded that the defendants should have the benefit of the conduit defense.

Of the two cases, the case involving St. John the Evangelist Catholic Church is more factually similar to the case at hand. That case involved a charitable donation made by the debtor to the Jamaica Outreach Program, an organization created to raise money for Food for the Poor, an international faith-based charitable organization raising money for its Jamaica Housing

---

[8] Adv. No. 8:08-mp-00002, Doc. No. 179 at 26:20-25.

[9] *Id.*

[10] *Id.*

[11] *Tardif v. Herrling (In re Engler),* 490 B.R. 622, 57 B.C.D. 231 (Bankr. M.D. Fla. 2013); *Tardif v. St. John the Evangelist Catholic Church (In re Engler)*, 497 B.R. 125, 69 C.B.C.2d 1506, 58 B.C.D. 54 (Bankr. M.D. Fla. 2013).

Project. The Jamaica Outreach Program asked the church if it would receive donations on its behalf, and the church agreed.[12]

Numerous donations were made to the church, one of these from the debtor. No separate bank account was set up by the church. Rather, checks would come in with a memo line indicating that the donation should be earmarked for the Jamaica Housing Project. Thereafter, the checks were deposited into the church's general operating account and co-mingled with the church's general operating revenues. Importantly, the church created a bookkeeping subaccount to separate the account for those donations. And the church held the funds until the Jamaica Outreach Program requested a disbursement. The church disbursed all of the funds it received to the Jamaican project.[13]

The Eleventh Circuit has stressed that "'courts must look beyond the particular transfers in question to the entire circumstance of the transfers.'"[14] In other words, courts must step back and evaluate a transaction in its entirety to make sure that the court's conclusions are logical and equitable. Looking to the entire circumstance of the transfers, this Court concluded that even though checks were deposited into the church's general operating account, the church was not free to use that money as it wished. All of the funds were specifically earmarked for the Jamaican project and that is where the money went. The church's use of the debtor's donation was circumscribed by its legal obligation owed to the debtor and the Jamaican project. So, this Court concluded that the fact that the church deposited the money into its general operating account, by itself, did not compel a finding that the church had control over the funds. The

---

[12] *In re Engler*, 497 B.R. at 128.

[13] *Id.*

[14] *In re Pony Express*, 440 F.3d at 1302 (quoting *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir. 1988)).

church separately accounted for the donations it received on behalf of the Jamaican project. Additionally, this Court concluded that there was no dispute that the church acted in good faith and was an innocent participant in the debtor's fraudulent transfer.[15] There was no record evidence that the church was aware of the debtor's Ponzi scheme, or that the Ponzi scheme was the source of the debtor's donation.[16]

Similarly, in this case, the processes by which the Law Firm received and handled the settlement funds—including the payment of its fees from the funds transferred to its client— were entirely subject to federal court orders, federal law, and rules of professional responsibility. The Law Firm followed these proscriptions to the letter, and the money flowed through as it was required to do pursuant to various court orders entered by the bankruptcy court presiding over the case in which the settlement was approved. There is no question that the Law Firm acted in good faith, even though the money went from the debtor to a trust account and then to an operating account to be disbursed. Such a process was part of the regular practice of handling funds. Moreover, the fact that part of the funds were paid to the Law Firm does not change the result, as those payments were made from funds transferred to the client as approved by a final binding order of the bankruptcy court presiding over the transactions in question.

In support of its conduit defense, the Law Firm cites two additional cases that are important to a discussion of preferences under § 550 of the Bankruptcy Code: *In re Fabric Buys of Jericho*, *Inc.*[17] and *In re Bridges Enterprises, Inc.*[18] Though older, both cases are instructive regarding preference actions under § 547 and whether an attorney receiving settlement funds is

---

[15] *In re Engler*, 2013 WL 3755974, at *3.

[16] *Id.*

[17] *Gropper v. Unitrac, S.A.* (*In re Fabric Buys of Jericho, Inc.*), 33 B.R. 334 (Bankr. S.D.N.Y. 1983).

[18] *Ducker v. Fairmeadows II* (*In re Bridges Enterprises, Inc.*), 62 B.R. 300 (Bankr. S.D. Ohio 1986).

an initial transferee under § 550.  In *Fabric Buys,* Unitrac, one of the debtor's creditors, retained the Hopgood law firm to sue the debtor to recover damages for goods sold. The parties settled Unitrac's claim for $37,000. The settlement check was made payable to Unitrac and a member of the Hopgood firm. The Hopgood firm deposited the check into its escrow account. Eleven days later, the Hopgood firm issued a $37,000 check to Unitrac. Unitrac later deposited the settlement check. Two months later, the Debtor filed for bankruptcy and the trustee sued Unitrac and Hopgood to avoid the transaction under § 547 and recover a judgment under § 550.

The court in that case held that the Hopgood firm was not an initial transferee. According to the court, the Hopgood firm acted as a mere conduit.[19] The fact that the settlement payment was funneled through the trust account did not make Hopgood an initial transferee.[20] And even if it did, the court concluded that it was appropriate to exercise its equitable powers to prevent an inequitable result because the Hopgood firm merely acted as Unitrac's agent and did not receive the benefit of the settlement payment.[21]

*In re Bridges Enterprises* involved similar facts. In that case, the Fairmeadows and Armstrong Company sued the debtor to recover $200,000 for breach of contract. The parties eventually settled for $10,000. Shortly after the settlement, the debtor sent a check to its attorney who deposited the settlement check, which was made payable to the debtor's attorney, into his trust account. The debtor's attorney then sent a check made payable jointly to Fairmeadows' principal and its attorney. After Fairmeadows' attorney endorsed the check, Fairmeadows deposited the check into its checking account. That same day the debtor filed for bankruptcy.

---

[19] *In re Fabric Buys of Jericho, Inc.*, 33 B.R. at 337.

[20] *Id.*

[21] *Id.*

The trustee then brought an action to recover the $10,000 payment from Fairmeadows and its attorney, among others, as a preferential transfer.

The court initially concluded that the $10,000 settlement payment was a preferential transfer. But, the court then concluded that neither Fairmeadows nor the debtor's attorneys were initial transferees under § 550 because both attorneys merely functioned as agents of their respective clients and served as conduits to effect the parties' settlement.[22] Like the court in *Fabric Buys,* the *Bridges Enterprises* court also concluded that it would exercise its equitable discretion to prevent the trustee from recovering from either attorney, if the attorneys could somehow be deemed initial transferees.[23]

Both *Fabric Buys* and *Bridges Enterprises* are similar to the case at hand in at least two respects. First, neither *Fabric Buys* nor *Bridges Enterprises* involved any allegations that the attorneys involved were aware that the transfers were potentially preferential transfers.  And second, there were no facts in either case that would suggest the attorneys did not act in good faith, so there is no question that the attorneys in *Fabric Buys* and *Bridges Enterprises* would satisfy the *Harwell* test.

Similarly, the case at hand does not involve any allegations of fraudulent transfers.  Here, the Law firm was counsel for the plan trustee of the SC Trust. The Law firm did not represent the debtor in the Solar Cosmetics case, nor did the Law Firm have any relationship with the debtor in the Solar Cosmetics case. As such, the Law Firm was not aware that the transfers were potentially preferential transfers. And, as above, there are no facts in the instant case that would suggest the Law Firm did not act in good faith. The Law Firm handled the settlement funds at the direction of the plan trustee, with the bankruptcy court's approval. So, as in *Fabric Buys* and

---

[22] *In re Bridges Enterprises, Inc.*, 62 B.R. at 303.

[23] *Id.*

*Bridges Enterprises*, there is no question that under the circumstances of the case at hand, the Law Firm would satisfy the *Harwell* test.

## Conclusion

For the foregoing reasons, the Court concludes that the Law Firm (i) served as a mere conduit for the six preferential transfers in question; and (ii) acted in good faith and as an innocent participant in the transfers. Consequently, the Plan Trustee may not recover the value of the six transfers ($30,000) from the Law Firm under 11 U.S.C. 550(a)(1). By separate order, summary judgment has been entered in favor of the Law Firm and this proceeding dismissed.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on _November 26, 2013_____.

_____
Michael G. Williamson
United States Bankruptcy Judge


Attorney Jeffrey P. Bast is directed to serve a copy of this opinion on interested parties and file a proof of service within 3 days of entry of the opinion.

Jeffrey P. Bast, Esq.
Bast Amron LLP
*for Defendant*

David S. Jennis, Esq.
Kathleen L. DiSanto
Jennis & Bowen, P.L.
*for Plaintiff*